# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

| | | |
|---|---|---|
| VALERIE BEZDEK, Individually and on Behalf of All Others Similarly Situated, | ) | Case No. 12-10513-DPW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Leave to File Granted on August 4, 2014** |
| | ) | |
| VIBRAM USA INC. and VIBRAM FIVEFINGERS LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

| | | |
|---|---|---|
| BRIAN DE FALCO, Individually and on Behalf of All Others Similarly Situated, | ) | Case No. 13-10764-DPW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Leave to File Granted on August 4, 2014** |
| | ) | |
| VIBRAM USA INC. and VIBRAM FIVEFINGERS LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
## FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

I.  INTRODUCTION ................................................................................ 1

II.  THE SETTLEMENT WARRANTS FINAL APPROVAL ............................ 4

    A.  The Standard for Final Approval of a Class Action Settlement ............................ 4

    B.  The Settlement Satisfies the Criteria for Final Approval ....................... 6

        1.  Arm's-Length Negotiations ..................................................... 7

        2.  Investigation and Discovery Completed ................................... 7

        3.  Quality of Counsel ................................................................. 9

        4.  The Complexity, Expense, and Likely Duration of the Litigation ........... 10

        5.  The Reaction of the Class to the Settlement ............................. 11

        6.  The Risks of Establishing Liability and Damages ..................... 12

        7.  The Risk of Maintaining the Class Action Through Trial ........................ 14

        8.  The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Range of Reasonableness of the Settlement Fund to a Possible Recovery in Light of All the Attendant Risks of Litigation ...................................................................... 14

III.  CLASS CERTIFICATION ........................................................... 15

IV.  NOTICE TO PROSPECTIVE CLASS MEMBERS WAS ADEQUATE ....................... 16

V.  PLAINTIFFS' FEE AND EXPENSE APPLICATION AND PLAINTIFF SERVICE AWARDS SHOULD BE APPROVED ....................................... 18

    A.  Legal Standard ...................................................................... 18

    B.  The Requested Percentage of the Settlement is a Reasonable Fee Award Under Factors Considered by Courts in the First Circuit ................................. 20

        1.  The Extent of the Benefit Obtained ........................................ 20

        2.  Reaction of the Class Members ............................................. 21

**3.**    The Skill and Efficiency of the Attorneys Involved ................................. 21

**4.**    Complexity and Duration of the Litigation.............................................. 22

**5.**    The Risk that the Litigation Will Be Unsuccessful ................................. 24

        **a.** Success at Trial Was Far From Granted................................................. 24

        **b** . The Contingent Nature of Plaintiffs' Counsel's Representation Also
        Supports the Requested Fee ..................................................................... 24

**6.**    The Amount of Time Devoted to the Case by Plaintiffs' Counsel ........... 27

        **a.** Investigation, Complaints, Motions to Dismiss and Discovery ........... 27

        **b.** Settlement Negotiations...................................................................... 29

**C.**    The Requested Fees Fall Well Within the Range of Fees Awarded in Cases
Within the First Circuit ..................................................................................... 30

**D.**    Plaintiffs' Counsel's Lodestar Supports Their Fee Request ................................ 31

**E.**    Plaintiffs' Counsel's Request for Reimbursement of Expenses
Should Be Granted ............................................................................................. 33

**F.**    Each Plaintiff Should Be Awarded a Service Award ........................................... 34

**VI.**    CONCLUSION............................................................................................................. 36

# TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*In re Aetna Inc. Securities Litigation,*
   No. MDL 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) .........................................33

*In re American Bank Note Holographics, Inc., Securities Litigation,*
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ...................................................................... 25

*Anixter v. Home-Stake Production Co.,*
   77 F.3d 1215 (10th Cir. 1996)..................................................................................... 26

*Applegate v. Formed Fiber Technologies, LLC,*
   No. 10-473, 2013 U.S. Dist. LEXIS 166171 (D. Me. Nov. 21, 2013)........................ 31

*Backman v. Polaroid Corp.,*
   910 F.2d 10 (1st Cir. 1990) ...................................................................................... 26

*Beane v. Bank of N.Y. Mellon,*
   No. 07 Civ. 09444 (RMB), 2009 U.S. Dist. LEXIS 27504
   (S.D.N.Y. Mar. 31, 2009) ..........................................................................................34

*In re Blech Securities Litigation,*
   Nos. 94 CIV. 7696(RWS), 95 CIV. 6422(RWS),
   2000 U.S. Dist. LEXIS 6920 (S.D.N.Y. May 19, 2000)............................................32

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980)..........................................................................................18, 31

*Bussie v. Allmerica Financial Corp.,*
   No. 97-CV-40204, 1999 U.S. Dist. LEXIS 7793 (D. Mass. May 19, 1999)........................... 35

*City of Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974) ..............................................................................4, 5

*City Partnership Co. v. Atlantic Acquisition Limited Partnership,*
   100 F.3d 1041 (1st Cir. 1996)............................................................................4, 5, 7

*Comcast Corp. v. Behrend,*
   133 S. Ct. 1426 (2013) ............................................................................................. 23

*In re Computron Software, Inc., Securities Litigation,*
   6 F. Supp. 2d 313  (D.N.J. 1998)............................................................................ 22

*Conley v. Sears, Roebuck & Co.,*
   222 B.R. 181 (D. Mass. 1998) ................................................................................19

*In re Continental Illinois Securities Litigation,*
  962 F.2d 566 (7th Cir. 1992) ........................................................................26

*Covillo v. Specialty's Café,*
  No. C-11-00594 DMR, 2014 U.S. Dist. LEXIS 29837 (N.D. Cal. Mar. 6, 2014) ...................32

*In re CVS Corp. Securities Litigation,*
  C.A. No. 01-11464 (JLT), slip op. (D. Mass. Sept. 7, 2005)........................................33

*Duhaime v. John Hancock Mutual Life Insurance Co.,*
  989 F. Supp. 375 (D. Mass. 1997) ...................................................................19

*Durrett v. Housing Authority of the City of Providence,*
  896 F.2d 600 (1st Cir. 1990)...........................................................................3

*Elkins v. Equitable Life Insurance Co.,*
  No. 96-296-CV-T-17B, 1998 U.S. Dist. LEXIS 1557 (M.D. Fla. Jan. 27, 1998) ................30

*In re Equity Funding Corp. Securities Litigation,*
  438 F. Supp. 1303 (C.D. Cal. 1977) ................................................................22

*In re Fidelity/Micron Securities Litigation,*
  167 F.3d 735 (1st Cir. 1999)....................................................................18, 33

*In re Fleet/Norstar Securities Litigation,*
  935 F. Supp. 99 (D.R.I. 1996) ...................................................................5, 19

*Giusti-Bravo v. United States Veterans Administration,*
  853 F. Supp. 34 (D.P.R. 1993)........................................................................9

*Greenspun v. Bogan,*
  492 F.2d 375 (1st Cir. 1984)....................................................................5, 16

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983) ................................................................................29

*Hotel Holiday Inn de Isla Verde v. N.L.R.B.,*
  723 F.2d 169 (1st Cir. 1983).........................................................................6

*In re Immune Response Securities Litigation,*
  497 F. Supp. 2d 1166 (S.D. Cal. 2007)..............................................................34

*In re Initial Public Offering Securities Litigation,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)...............................................................32

*In re Integra Realty Resources, Inc.*,
   262 F.3d 1089 (10th Cir. 2001) ................................................................16

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974)....................................................................30

*Kwaak v. Pfizer, Inc.*,
   71 Mass. App. Ct. 293 (Mass. App. Ct. 2008)........................................13

*Latorraca v. Centennial Technologies, Inc.*,
   834 F. Supp. 2d 25 (D. Mass. 2011) ........................................................ 30

*Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*,
   487 F.2d 161 (3d Cir. 1973)......................................................................32

*Lindy Brothers Builders v. American Radiator & Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976) .....................................................................32

*In re Lupron Marketing & Sales Practices Litigation*,
   228 F.R.D. 75 (D. Mass. 2005)............................................................ 6, 12

*In re Lupron Marketing and Sales Practices Litigation*,
   No. 01-CV-10861, 2005 U.S. Dist. LEXIS 17456
   (D. Mass. Aug. 17, 2005) ...............................................................*passim*

*Malanka v. de Castro*,
   Nos. 85-CV-2154, 88-CV-3505, 1990 U.S. Dist. LEXIS 18171,
   (D. Mass. Nov. 20, 1990) .........................................................................31

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007).....................................................................31

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
   671 F. Supp. 819 (D. Mass. 1987)...........................................................30

*Mills v. Electric Auto-Lite Co.*,
   396 U.S. 375 (1970)................................................................................ 33

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)................................................................................ 16

*National Association of Chain Drug Stores v. New England Carpenters Health Benefits Fund*,
   582 F.3d 30 (1st Cir. 2009)........................................................................4

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
   No. 05-11148, 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009)........................... 31, 33

*In re PaineWebber Limited Partnerships Litigation,*
  171 F.R.D. 104 (S.D.N.Y. 1997)...................................................................6

*In re Prudential Securities Limited Partnerships Litigation,*
  985 F. Supp. 410 (S.D.N.Y. 1997)...............................................................25

*In re Puerto Rican Cabotage Antitrust Litigation,*
  815 F. Supp. 2d 448 (D.P.R. 2011) ...................................... 24, 27, 36

*In re Pharmaceutical Industry Average Wholesale Price Litigation,*
  252 F.R.D. 83 (D. Mass. 2008).....................................................................13

*In re Relafen Antitrust Litigation,*
  231 F.R.D. 52 (D. Mass. 2005)............................................................ *passim*

*Ressler v. Jacobson,*
  149 F.R.D. 651 (M.D. Fla. 1992).................................................................21

*Robbins v. Koger Properties,*
  116 F.3d 1441 (11th Cir. 1997)................................................................ 26

*Rolland v. Celluci,*
  191 F.R.D. 3 (D. Mass. 2000).........................................................................9

*Saccoccio v. JP Morgan Chase Bank, North America,*
  297 F.R.D. 683 (S.D. Fla. 2014)..................................................................20

*In re San Juan Dupont Plaza Hotel Fire Litigation,*
  50 F. Supp. 2d 100 (D.P.R. 1999)................................................................25

*Scovil v. FedEx Ground Package System,*
  No. 10-515, 2014 U.S. Dist. LEXIS 33361 (D. Me. Mar. 14, 2014) .......................... 31

*Simonet v. GlaxoSmithKline,*
  No. 06-1230 (GAG/CVR), 2009 U.S. Dist. LEXIS 82508
  (D.P.R. Sept. 10, 2009) .............................................................................12

*Slomovics v. All for a Dollar, Inc.,*
  906 F. Supp. 146 (E.D.N.Y. 1995)............................................................... 11

*In re StockerYale, Inc. Securities Litigation,*
  No. 1:05cv00177-SM, 2007 U.S. Dist. LEXIS 94004 (D.N.H. Dec. 18, 2007).....................31

*Teachers' Retirement System v. A.C.L.N. Ltd.,*
  No. 01-CV-11814, 2004 U.S. Dist. LEXIS 8608 (S.D.N.Y. May 14, 2004) ........................24

*In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litigation,*
56 F.3d 295 (1st Cir. 1995) .................................................................................. 19

*Thompson v. Metropolitan Life Insurance Co.,*
216 F.R.D. 55 (S.D.N.Y. 2003) ..............................................................................5

*In re TJX Companies Retail Security Breach Litigation,*
584 F. Supp. 2d 395 (D. Mass. 2008) ..................................................................20

*In re Tyco International, Ltd. Multidistrict Litigation,*
535 F. Supp. 2d 249 (D.N.H. 2007) ................................................................. 4, 25

*United States v. 8.0 Acres of Land,*
197 F.3d 24 (1st Cir. 1999) .................................................................................. 19

*In re Visa Check/Mastermoney Antitrust Litigation,*
297 F. Supp. 2d 503 (E.D.N.Y. 2003) ..................................................................33

*Vizcaino v. Microsoft Corp.,*
290 F.3d 1043 (9th Cir. 2002) ..............................................................................31

*Wexler v. United Air Lines, Inc.,*
496 F. Supp. 2d 150 (D.D.C. 2007) ................................................................ 15, 21

*Wildman v. Lerner Stores Corp.,*
771 F.2d 605 (1st Cir. 1985) ................................................................................33

*Williams v. MGM-Pathe Communications Co.,*
129 F.3d 1026 (9th Cir. 1997) ..............................................................................31

## STATUTES AND RULES

California Consumer Legal Remedies Act, Civil Code § 1750 ......................................28

California Unfair Competition Law, Business & Professions Code § 17200 ..............................28

Class Action Fairness Act of 2005
28 U.S.C. § 1715(b) ..............................................................................................17

Federal Rules of Civil Procedure
(23) ............................................................................................................... 15, 16
(23)(c)(2) .........................................................................................................18
(23)(e) ...............................................................................................................4
(23)(e)(2) ...........................................................................................................4

Florida Statutes § 501.201 ................................................................................................28

Massachusetts General Laws
  Chapter 26, § 91 ...........................................................................................................28

## OTHER AUTHORITIES

Manual for Complex Litigation, Fourth (2004)
  § 21.62.........................................................................................................................6

Newberg & Conte, *Newberg on Class Actions* (4th ed. 2002)
  § 11.42.........................................................................................................................6

Plaintiffs Valerie Bezdek (the "Class Representative"), Brian De Falco and Ali Safavi (collectively, including the Class Representative, "Plaintiffs") respectfully submit this memorandum in support of the motion for final approval of class action settlement and Plaintiffs' request for an award of attorneys' fees, reimbursement of expenses, and a service award for Plaintiffs.   *See* ECF Nos. 77 (the Second Amended Settlement Agreement (the "Settlement Agreement"), 76 ("Order Authorizing Notice").[1]

## I.   INTRODUCTION

Plaintiffs seek final approval of the proposed nationwide Settlement of this class action against Defendants Vibram USA Inc. and Vibram FiveFingers LLC (collectively "Vibram" or "Defendant").   The Settlement was reached following vigorous litigation, including substantial discovery from parties and subpoenaed non-parties, as well as motion practice that included the filing of two motions to dismiss in the *Bezdek* action alone.   The Parties also attended an arm's-length mediation, which generated subsequent settlement negotiations over the course of a year between the Parties, and ultimately resulted in the Settlement.

The Settlement provides for the creation of a $3.75 million non-reversionary Settlement Fund.  Class Members are eligible for monetary awards for each pair of footwear purchased and no proof of purchase is required for the first two pairs.  Under no circumstances will any amount in the Settlement Fund revert to Vibram.  Moreover, the Settlement provides additional benefits to Class Members as Vibram has agreed, *inter alia*, to discontinue the marketing campaign that gave rise to this litigation.   *See* Settlement Agreement, § IV.B.2.  Plaintiffs' objectives in the litigation are fully met by the terms of the Settlement.

---

[1]     All capitalized terms have the same meaning as set forth in the Settlement Agreement.

The Claim Form is exceedingly simple and straightforward, as demonstrated by the number of claims already filed. *See* Settlement Agreement, Ex. 1 (the Claim Form). Although very unlikely, if not all of the Settlement Fund is used, the remainder will be distributed pursuant to the *cy pres* doctrine to the American Heart Association with specific directions that such funds be used for research regarding health benefits associated with running or exercise or substantially similar research. *See* Settlement Agreement, § III.C. The American Heart Association is an appropriate nonprofit entity with nationwide reach that will use the leftover funds for relevant purposes.

The award of attorneys' fees and expenses requested by Plaintiffs' Counsel, and to which the parties agreed in the Settlement, is well within the ranges established by relevant case law. The Settlement provides that Vibram will not oppose an award of attorneys' fees up to $937,500, plus reimbursement of out-of-pocket expenses not to exceed $70,000. *See* Settlement Agreement, § VIII.A. Thus, the award of attorneys' fees represents only 25% of the Settlement Fund. Plaintiffs' Counsel seek reimbursement of $62,133.68 in actual expenses - less than the amount Vibram agreed to not oppose and less than what was stated in the Notice. Moreover, Plaintiffs' Counsel have prosecuted the Actions on a completely contingent basis, accruing over $1,243,539.75 in attorneys' fees based on 2,262.10 hours worked. Thus, and as detailed below, the $937,500 fee award amounts to a fractional multiplier of Plaintiffs' Counsel's lodestar. Accordingly, Plaintiffs' Counsel's requested Attorneys' Fees and Expenses are well within the accepted range of attorney fee awards in class settlements.

The Settlement represents an excellent recovery for the Class – a point confirmed by the fact that, as of July 31, 2014, just 16 Class Members, to date, have elected to opt-out and no Class Member has objected to the Settlement. *See* Declaration of James R. Prutsman, MBA, In

2

Support of Motion for Final Approval of Class Action Settlement ("Prutsman Decl.," attached as Exhibit 2), ¶¶ 9, 20-21.[2]   The Settlement Administrator also implemented a robust, Court-approved Class Notice program which included (1) direct notice sent to 217,761 email addresses, with follow up mailings of postcard notices to 77,441 potential Class Members for whom the initial email bounced back or was otherwise undeliverable; (2) publication in print and electronic versions of *Runner's World*, a national magazine with an estimated print circulation of approximately 673,000 and readership of 2.86 million; (3) four weeks of Internet publication by banner advertising on Facebook (specifically targeting Class Members' demographics), and several online networks that include hundreds of highly trafficked websites throughout the United States that generated more than 300 million impressions; and (4) publication for four weeks on a mobile network with close to 50,000 apps across all mobile and tablet platforms targeted towards adults 25-54 who run, walk or participate in other fitness activity (including, *inter alia*, New York Times Health and Fitness, Everyday Health and ESPN News).  *See id.*, ¶¶ 6-7, 11-15.  Additionally, there have been more than 900 online news mentions and more than 31,400 Tweets concerning the Settlement.  *Id.*, ¶ 16.

For final review of a class action settlement, it must not be overlooked that there is a "clear policy in favor of encouraging settlements."[3]  *Durrett v. Housing Auth. of the City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  Where, as here, "sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the

---

[2]   The objector and opt-out figures are current through July 31, 2014.  Pursuant to the Order Authorizing Notice, the deadline for opting out or objecting to the Settlement is August 15, 2014.  Further pursuant to that Order, Plaintiffs will respond to all objections, if any, on or before October 15, 2014.

[3]   Internal quotes and citations omitted unless otherwise specified.

settlement." *City Partnership Co. v. Atlantic Acquisition Ltd. Partnership*, 100 F.3d 1041, 1043 (1st Cir. 1996).   As demonstrated below, the proposed Settlement is, under all circumstances, "fair, reasonable and adequate" under Fed. R. Civ. P. 23(e)(2) and thus warrants final approval by this Court.   *Id.*   Likewise, as demonstrated below, the Class meets all the applicable requirements; therefore, the Court should grant final certification of the Settlement Class. Finally, the Court should grant approval of the award of Attorneys' Fees and Expenses and Service Awards, which are also fair and reasonable.

## II.  THE SETTLEMENT WARRANTS FINAL APPROVAL

### A.  The Standard for Final Approval of a Class Action Settlement

Pursuant to Rule 23(e), after directing notice to all class members in a reasonable manner and prior to granting final approval to the proposed settlement, the Court must conduct a fairness hearing and determine whether the settlement's terms are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).   "In the First Circuit, this requires a wide-ranging review of the overall reasonableness of the settlement that relies on neither a fixed checklist of factors nor any specific litmus test." *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007). As the First Circuit has explained:

> Rule 23's reasonableness standard has been given substance by case law offering laundry lists of factors, most of them intuitively obvious and dependent largely on variables that are hard to quantify; usually, the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.

*Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund,* 582 F.3d 30, 44 (1st Cir. 2009) (citing, among other sources omitted here, *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).   Nevertheless, courts within the First Circuit have

looked to factors set forth in *Grinnell*, 495 F.2d at 463 (the "*Grinnell* factors"). The *Grinnell* factors are:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* at 463; *see also In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 72 (D. Mass. 2005). While instructive, courts reviewing settlements recognize that not all *Grinnell* factors employed in evaluating a settlement must be satisfied. Instead, a court should look at the factors in light of the circumstances of each case. *See Thompson v. Metro. Life Ins. Co.,* 216 F.R.D. 55, 61 (S.D.N.Y. 2003). Further, the Court should neither substitute its judgment for that of the parties who negotiated the settlement, nor conduct a mini-trial on the merits of the action. *See Greenspun v. Bogan,* 492 F.2d 375, 381 (1st Cir. 1984) ("[A]ny settlement is the result of a compromise – each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.").

Settlement approval is committed to the Court's discretion, which should be exercised in light of the strong public policy favoring settlement. *See City P'ship,* 100 F.3d at 1043-44; *see also In re Fleet/Norstar Sec. Litig.*, 935 F. Supp. 99, 105 (D.R.I. 1996) ("The district court's discretion is circumscribed by the long-recognized policy of encouraging settlements."). Where, as here, "sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." *City P'Ship,* 100 F.3d at 1043; *see also Hotel Holiday*

*Inn de Isla Verde v. N.L.R.B.*, 723 F.2d 169, 173 n.1 (1st Cir. 1983) (citing the principle that "settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits") *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005) ("When a settlement class is proposed, it is incumbent on the district court to give heightened scrutiny to the requirements of Rule 23 in order to protect absent class members.  This cautionary approach notwithstanding, the law favors class action settlements.").  "So long as the integrity of the arm's length negotiation process is preserved . . .  a strong initial presumption of fairness attaches to the proposed settlement."  *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y. 1997); *see also* Manual for Complex Litigation, Fourth § 21.62 (2004); Newberg & Conte, *Newberg On Class Actions* § 11.42 (4th ed. 2002) ("As a practical matter, the overwhelming majority of proposed settlements are approved when the court is satisfied that arm's-length bargaining took place during settlement negotiations and experienced class counsel has recommended approval of the settlement.").

### B.     The Settlement Satisfies the Criteria for Final Approval

As demonstrated below, the Settlement satisfies the criteria for final approval.  In the experienced judgment of Plaintiffs' Counsel, the risks faced by Plaintiffs and the Class in proceeding with the litigation, and the uncertainty that a more favorable result could be obtained if this case were litigated against Defendant through trial and the inevitable post-trial motions and appeals, militate strongly in favor of approving the Settlement.  Class Members submitting claims will receive refunds of a portion of the purchase price of the FiveFingers footwear and Defendant will be enjoined from continuing the marketing and advertising campaigns at issue.  When the Settlement is considered in balance against the needless risk and expense of proceeding through

trial, it is more than adequate for final approval.  Furthermore, individual criteria used by courts in the First Circuit also weigh in favor of final approval of the Settlement, as described more fully below.  *See*, *e.g.*, *In re Relafen Antitrust Litig.,* 231 F.R.D. at 71-74.

### 1.       Arm's-Length Negotiations

The Parties engaged in many pre-settlement discussions and arm's-length negotiations prior to achieving the Settlement.   *See* ECF No. 72-1 (Declaration of Janine L. Pollack in Support of Motion for Preliminary Review of Class Action Settlement, Authorization of Class Notice and Setting of Final Approval Hearing ("Pollack Preliminary Review Decl.")), ¶ 19 (describing how initial mediation efforts before an independent mediator failed, but the Parties continued to negotiate for a year even during extensive discovery and motion practice).  Each side vigorously advocated its positions during multiple rounds of often spirited negotiations and weighed the costs and benefits of engaging in further litigation.  Through these comprehensive negotiations, Lead Class Counsel advocated the best case possible while pressing for the maximum recovery achievable.   The time and effort spent, and the circumstances of the negotiations are persuasive indicators that there was no collusion in either the negotiation process or the result achieved.  This factor supports a presumption of fairness.  *See City P'Ship*, 100 F.3d at 1043.

### 2.       Investigation and Discovery Completed

Plaintiffs' Counsel's in-depth knowledge of the litigation resulting from their investigation and discovery supports the Settlement.   Prior to entering into the Settlement, Plaintiffs' Counsel conducted a thorough investigation and analysis of Plaintiffs' legal claims, and conducted an extensive fact investigation.   Plaintiffs' Counsel vetted Defendant's numerous advertisements and other representations pertaining to its FiveFingers footwear products across

several different forms of media – including print and Internet ads. This review included advertisements for the FiveFingers footwear on Vibram's www.vibramfivefingers.com website. Plaintiffs' Counsel reviewed Defendant's public documents, including press releases, as well as reports on Defendant's advertising campaign in industry news sources to build a detailed understanding of Defendant's sales and marketing strategy and results. *See* Pollack Preliminary Review Decl., ¶ 14. Furthermore, Plaintiffs' Counsel reviewed numerous published scientific studies concerning exercise physiology and biomechanics and conferred with experts in the relevant fields, including a professor who is an expert in the orthopedic and physiological effects of footwear on the human body, to develop a complete understanding of the alleged lack of scientific support for Vibram's claims about muscle strengthening and injury prevention. *See id*.

In addition, Plaintiffs engaged in significant formal discovery. On July 10, 2013, Plaintiffs served on Vibram fifty-eight (58) requests for production, fourteen (14) interrogatories and eighteen (18) requests for admission. *See id*., ¶ 10. This resulted in the production by Vibram of over 52,000 pages, primarily in electronic form, but including some in hard copy. *See id.*, ¶ 14. Lead Class Counsel established a dedicated document database for this litigation to review and categorize documents received by Defendant and third-parties. *See id.*

Lead Class Counsel also sought and obtained substantial discovery through third-party subpoenas to four third-parties. *See id.*, ¶ 15. Lead Class Counsel engaged in meet and confer efforts with certain of these subpoenaed parties to obtain responsive documents, which ultimately resulted in the production of tens of thousands of pages of documents which were reviewed by Lead Class Counsel. *See id.*

Plaintiffs' Counsel used the product of these efforts to help shape their case and the Settlement. Thus, this litigation had advanced to a stage where the Parties certainly have a clear view of the strengths and weaknesses of their case, which they determined favored a settlement. Taken as a whole, this investigatory work and discovery favor a settlement and provide a basis for the Court to grant final approval of the Settlement.

### 3.   Quality of Counsel

In approving class settlements, courts give great weight to the opinion and judgment of experienced counsel who have conducted arm's-length negotiations. "When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable, and adequate should be given significant weight." *Rolland v. Celluci*, 191 F.R.D. 3, 10 (D. Mass. 2000). With respect to the quality of counsel, courts have looked at various factors, including "the length of their involvement with the litigation, their competence, and their experience in this type of litigation." *Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 40 (D.P.R. 1993).

Plaintiffs' Counsel respectfully submit that the quality of their work in this case is apparent from their vigorous prosecution of the Actions, and certain of Plaintiffs' Counsel's background and expertise gained in other deceptive advertising litigation in general, and those having to do with footwear toning products in particular. For example, Ms. Pollack and her co-counsel from Blood Hurst & O'Reardon ("BHO") have recently prosecuted a number of false advertising class actions concerning the advertised scientific substantiation relating to toning and strengthening benefits provided by Reebok, Skechers, and FitFlop footwear, among others. Ms. Pollack and Tim Blood from BHO worked as co-lead counsel on these matters along with certain other of Plaintiffs' Counsel in this case. In two of these actions, against Reebok and Skechers,

Ms. Pollack and Mr. Blood worked with the Federal Trade Commission to bring about unique and historic settlements. In the current litigation, Mr. Blood again worked closely with Lead Class Counsel, providing his expertise in this field and assisting with all aspects of the litigation. Indeed, Lead Class Counsel's and Mr. Blood's experience and expertise gained in other deceptive advertising litigations, including working with scientific experts and reaching nationwide settlements, contributed to counsel's ability in this matter to (1) research and understand the purported scientific basis for Vibram's advertised claims prior to filing the complaint; (2) efficiently pursue discovery relating to complex issues of science; (3) obtain necessary evidence concerning issues of science, marketing and damages; and then (4) resolve the claims without further litigation.

Lead Class Counsel believes that this Settlement meets each of the requirements for final approval. Based on experience in other cases involving similar issues and retail products, this Settlement, news of which was widely disseminated through the extensive Class Notice program, provides Class Members with an efficient opportunity to recover a portion of the purchase price they paid for FiveFingers footwear. Coupled with the injunctive relief, the Settlement is fair, reasonable and adequate. Thus, the quality and opinions of experienced Plaintiffs' Counsel militate in favor of final approval of this Settlement.

### 4.      The Complexity, Expense, and Likely Duration of the Litigation

The complexity, expense, and likely duration of the litigation also weigh in favor of approving the Settlement. Here, prevailing on the claims advanced by Plaintiffs would involve numerous legal and factual issues that would require many depositions and extensive expert discovery and testimony, significantly adding to the expense and duration of the litigation. This is particularly true in regards to the applicability of these claims on a nationwide basis to provide

the most effective and efficient relief to all consumers who purchased the FiveFingers footwear, as well as the challenges associated with assessing the complex, scientific issues concerning Vibram's marketing claims.  In addition, Plaintiffs would be required to prove both their theory and calculations of recoverable damages with the help of expert testimony.  Plaintiffs would also have to retain a marketing expert to opine on the materiality of the challenged advertising based either on a review of market research possessed by Vibram or through independent survey(s).  Thus, conducting the balance of fact and expert discovery with regard to these claims would be a complex and expensive endeavor.  Absent a settlement, Vibram would challenge the merits of Plaintiffs' claims at every stage of pretrial proceedings and through trial, resulting in additional years of expensive and hotly contested litigation.  Moreover, even if the Class could recover a judgment after a trial, the additional delay through post-trial motions and the appellate process could deny the Class any recovery for years and, with the passage of time, make it more difficult to locate and pay Class Members if and when a favorable judgment became final.

The Settlement consists of cash payments to Class members from a total Settlement Fund of $3.75 million (less fees and expenses), as well as changes in the Defendant's marketing campaigns resulting in an immediate tangible recovery without the considerable risk, expense, and delay of trial.  This result weighs heavily in favor of the proposed Settlement.  *See Slomovics v. All for a Dollar, Inc.,* 906 F. Supp. 146, 149 (E.D.N.Y. 1995) ("The potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class.").

### 5.   The Reaction of the Class to the Settlement

The reaction of the Class to the Settlement has been overwhelmingly positive.  Out of a nationwide class consisting of purchasers of millions of pairs of FiveFingers footwear, as of July

31, 2014 no objections to the Settlement have been received, and there have been only 16 requests for exclusion. *See* Prutsman Decl., ¶ 9.   Given the extensive nationwide Notice submitted in this case, the overall reaction of the Class supports, rather than detracts from, the reasonableness, fairness and adequacy of the Settlement. *See Simonet v. GlaxoSmithKline*, No. 06-1230 (GAG/CVR), 2009 U.S. Dist. LEXIS 82508, at *9-10 (D.P.R. Sept. 10, 2009) (approving settlement in light of, among other things, "the overwhelming, nearly unanimous support for the settlement demonstrated by the absence of any other objections, and the small number of exclusion requests").

### 6.      The Risks of Establishing Liability and Damages

While Plaintiffs' Counsel believe Plaintiffs would ultimately prevail at trial, they recognize that ultimate success is far from assured and believe this substantial Settlement, when viewed in light of the risks of proving liability and greater recoverable damages, is undoubtedly fair, adequate, and reasonable.  *See Lupron*, 228 F.R.D. at 97 ("As any experienced lawyer knows, a significant element of risk adheres to any litigation taken to binary adjudication.").

Vibram has been ably represented by its counsel, and, in recognition of the strength of Plaintiffs' claims, agreed to work with Plaintiffs to resolve those claims in a manner that will provide Class Members with meaningful monetary relief and implement changes that enjoin Defendant from engaging now and in the future in the type of marketing campaigns challenged by Plaintiffs.  And, even though Plaintiffs asserted nationwide applicability of Massachusetts law on a Massachusetts headquartered Defendant, Plaintiffs recognize that Defendant may have been able to raise challenges to Plaintiffs' ability to prevail on class certification and may have further challenged Plaintiffs' substantive claims for relief with countervailing evidence and argument concerning, *e.g.*, myriad reasons why absent class members purchased the products at issue.  *See*,

*e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) ("While numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk. . . . Some courts have rejected efforts to certify a class under multiple state consumer protection laws, finding that the variances in the substantive prerequisites of such laws render certification too daunting."); *Kwaak v. Pfizer, Inc.*, 71 Mass. App. Ct. 293, 301-302 (Mass. App. Ct. 2008) (denying certification of consumer class related to allegedly deceptive Listerine mouthwash marketing; "There were [] too many different reasons why consumers purchased these particular products, too many different types of advertisements, too much variation in exposure to the advertisements, too fine a line between permissible puffery and actionable deception in the different advertisements, and too little information on the market impact of the deceptive aspects of the advertising campaign to support a conclusion that the consumers in the class certified were similarly situated and similarly injured by a common deceptive act or practice.").   For example, Vibram has already argued that "[c]ertainly, the motivations and expectations of potential class members…are different" and class members' "purchasing experience, and their exposure to Vibram's marketing, would necessarily be substantially different from Plaintiff's."  *See* ECF No. 11 at 17-18; *see also Safavi* Dkt., ECF No. 19 at 17 (arguing that the class action allegations should be stricken because, *inter alia*, "FiveFingers shoes are worn for many reasons, and many consumers use them for purposes unrelated to the Complaint, including water sports, travel, hiking, yoga, and even just fashion. Indeed, some consumers buy FiveFingers merely because they look different.").  Furthermore, Plaintiffs faced risks in establishing the amount of individual relief to which individual Class Members were entitled, if any.  *See* ECF No. 1 (Complaint), ¶ 4 (alleging that on the basis of their health benefit claims, Vibram "charge[s] a premium for FiveFingers" over conventional

running shoes), ¶¶ 84 and 86 (same).  Plaintiffs' Counsel anticipates that Defendant would have likely argued that any recoverable premium would have been a mere fraction of the purchase price of the footwear given that, as noted above, Defendant argued that purchases of FiveFingers bought them for a variety of reasons.

While Plaintiffs' Counsel remain confident in their ultimate ability to prove the claims asserted at both the class certification and trial phases of this litigation, the risks of losing at either or both of those stages, particularly when weighed against the immediate benefits of the Settlement, indicate that the Settlement is in the best interests of the Class.

### 7.     The Risk of Maintaining the Class Action Through Trial

Although Plaintiffs' Counsel believe Plaintiffs would be successful in obtaining a litigated class certification, class certification always poses a substantial risk in consumer litigation.  A nationwide or even multi-state class greatly increases those risks, as discussed above.

### 8.     The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Range of Reasonableness of the Settlement Fund to a Possible Recovery in Light of All the Attendant Risks of Litigation

The Settlement immediately confers monetary benefits on the Class in the form of cash payments based on Class Members' purchases of FiveFingers footwear as well as significant injunctive relief.  This is a particularly good result given the various risks of continued litigation and the fullness of the relief achieved through the Settlement.  Plaintiffs were able to negotiate the creation of a non-reversionary cash Settlement Fund of $3.75 million will provide cash refunds to consumers.  Given the risks discussed above associated with Defendant's anticipated arguments regarding the amount of premium paid, and that the jury could find no premium or that such premium was only a small portion of the purchase price of the footwear, the fact that Class Members will receive cash payouts now militates strongly in favor of the

Settlement.   Class Members are also able to submit their claims electronically, significantly reducing any meaningful burden on or barrier to Class Member participation in the Settlement.

Furthermore, the Settlement mitigates future harm to consumers as Vibram has already changed its marketing campaign and will continue to comply in the future with the terms of the Settlement.  *See, e.g., Wexler v. United Air Lines, Inc.*, 496 F. Supp. 2d 150, 154 (D.D.C. 2007) ("[t]he value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant.").

Thus, considering the substantial benefit received by the Class under the Settlement, the probability of lengthy litigation in the absence of the Settlement, the risk that the Class would not have been able to succeed on the merits, and the likelihood that damages awarded by the Court would have been lower than those demanded by the Class, the Settlement is well within the range of reasonableness.

Weighing the benefits of the proposed Settlement against the risks of continued litigation, Plaintiffs' Counsel respectfully submit that the Settlement is a reasonable compromise under the facts and circumstances of this case and falls well within the range for approval.

## III.   CLASS CERTIFICATION

As the Court found in its Order Authorizing Notice, and as shown in Plaintiffs' Memorandum in Support of Motion for Preliminary Review of Class Action Settlement (ECF No. 72), the Settlement Class is appropriately certified for settlement purposes, meeting all of the relevant requirements of Rule 23.   Therefore, the Court should affirm its certification of the Settlement Class.

## IV.    NOTICE TO PROSPECTIVE CLASS MEMBERS WAS ADEQUATE

In determining whether to grant final approval of a proposed settlement, the Court must find that adequate notice was issued to all prospective class members, in accordance with due process concerns and Rule 23 of the Federal Rules of Civil Procedure.   In order to satisfy due process considerations, notice to class members must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."   *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).   In other words, the notice must describe fairly, accurately and neutrally the claims and parties in the litigation and the terms of the proposed settlement.   *See Greenspun,* 492 F.2d at 382.

The Court has already determined that the form of the Notice was proper.   The Court approved the long form Class Notice, Postcard Notice, Summary Settlement Notice and the notice methodology described in the Settlement Agreement.   *See* Order Authorizing Notice at 5-7.   The Court further found that these notices constitute "the best practicable notice;" are reasonably calculated to apprise class members of the terms of the Settlement and their rights; "constitute[] due and sufficient notice [] to all persons entitled thereto;" and "[are] in full compliance with the requirements of Fed. R. Civ. P. 23, applicable law, and due process."   *Id.* at 7.

Plaintiffs now seek Court determination that the notice program actually engaged in was fair, adequate, and appropriate.   It is not necessary that every Class Member receive actual notice to meet due process considerations, so long as class counsel acted reasonably in selecting means likely to inform persons affected.   *See In re Integra Realty Res., Inc.,* 262 F.3d 1089, 1110-11 (10th Cir. 2001) (holding Rule 23 and Due Process requisites satisfied where the record indicated that 77% of class members actually received notice of the settlement).

16

In accordance with the requirements of the Order Authorizing Notice, notice was implemented pursuant to the plan approved by the Court and as described in the declaration of the Notice Administrator.  *See* Order Authorizing Notice at 6-7; Prutsman Decl.  The Notice Program exceeded the Notice Administrator's original projections, delivering over 300,000,000 impressions, or opportunities to see the Notice, through traditional media, news articles, online advertising, mobile advertising, social media, and blogs.  *See* Prutsman Decl., ¶ 15.

As detailed in the Notice Administrator's Declaration, the Court-approved multi-faceted notice program included the following components:

- Direct e-mail notice to reasonably identifiable Class Members consisting of 217,661 e-mail addresses;

- Direct postcard notice to reasonably identifiable Class Members consisting of 77,411 physical addresses;

- CAFA Notice to appropriate state and federal government officials;[4]

- Publication of a short-form notice (the "Summary Settlement Notice") in *Runner's World*, a nationally-circulated consumer magazine used by Vibram itself to advertise FiveFingers footwear;

- Banner advertising on highly trafficked Internet websites;

- Mobile advertising on widely visited mobile and tablet websites;

- Facebook advertising targeting adults 25-54 who are interested in Vibram, FiveFingers, barefoot running, and fitness;

- An informational website (www.FiveFingersSettlement.com) on which the notices and other important Court documents are posted; and

- A toll-free information line (1-844-491-5740), available 24 hours per day, seven days per week, where Class Members could call for more information about the Settlement, including, but not limited to, requesting copies of the claim packet.

---

[4]     Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), and in accord with the Court's Order Authorizing Notice, the Notice Administrator on behalf of Vibram served a CAFA Notice and accompanying enclosures by Federal Express overnight delivery to the Attorney General of the United States, and the attorneys general of all states and territories, informing them of the proposed Settlement.  *See* Prutsman Decl., ¶ 10.

*See* Prutsman Decl., ¶¶ 11-18.   Class Members were also able to electronically submit proof of claim forms through the simple one-page claim form on the Settlement website, resulting in high Class Member participation in the Settlement.

As required by Federal Rule of Civil Procedure 23(c)(2), the Class Notice informed Class Members of the claims alleged in the Actions, the terms of the Settlement and their rights as members of the Settlement Class to object to the Settlement, or otherwise object to the proposed attorneys' fees and expenses and/or the individual service awards to the Plaintiffs.   Additionally, Class Members were advised of their rights to request exclusion from the Class.   *See* Order Authorizing Notice at 7.

Accordingly, the notice program fairly apprised Class Members of the Settlement and their options and satisfies the requirements of due process.

## V.   PLAINTIFFS' FEE AND EXPENSE APPLICATION AND PLAINTIFF SERVICE AWARDS SHOULD BE APPROVED

As provided in the Settlement Agreement, Plaintiffs' Counsel also petitions the Court for an award of attorneys' fees of $937,500, representing 25% of the $3.75 million Settlement Fund, and reimbursement of $62,133.68 in actual expenses.   As explained, the requested award of attorneys' fees represents a fractional multiplier of counsel's lodestar.   Both the attorneys' fees and expenses are reasonable and justified in this litigation. In addition, the requested Plaintiff service awards are also fair and reasonable and should be approved.

### A.   Legal Standard

The Supreme Court has recognized that when attorneys' efforts create a fund, those efforts entitle the attorneys to reasonable attorneys' fees from that fund.   *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) ("lawyers whose efforts succeed in creating a common fund for the benefit of a

class are entitled not only to reasonable fees, but also to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax").

This policy equitably provides that those who have profited from successful litigation should share in its costs. *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 n.6 (1st Cir. 1995) ("The common fund doctrine is founded on the equitable principle that those who have profited from litigation should share its costs").

In the First Circuit, a trial court enjoys "extremely broad latitude" in determining an appropriate fee award "and may calculate such an award either on the basis of a reasonable percentage of the fund, or using a lodestar method to multiply a reasonable hourly rate by the compensable hours the attorney worked on the matter." *United States v. 8.0 Acres of Land,* 197 F.3d 24, 33 (1st Cir. 1999); *see also Thirteen Appeals*, 56 F.3d at 309. Courts possess broad discretion "'because each common fund case presents its own unique set of circumstances,"' so each court "'must assess each request for fees and expenses on its own terms."' *8.0 Acres*, 197 F.3d at 33 (quoting *In re Fidelity/Micron*, 167 F.3d at 737).

Numerous courts in the First Circuit have awarded attorneys' fees from a common fund on a percentage of the fund basis. *See, e.g., Thirteen Appeals*, 56 F.3d at 307 (describing the advantages of the percentage of the fund approach over the lodestar/multiplier approach); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 187 (D. Mass. 1998) (measuring attorneys' fees in a class action settlement as a percentage of the common fund); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997) (same); *In re Fleet/Norstar*, 935 F. Supp. at 108 (same).

**B.    The Requested Percentage of the Settlement is a Reasonable Fee Award Under Factors Considered by Courts in the First Circuit**

Although the First Circuit has not established specific factors to be used in evaluating the reasonableness of a fee request, district courts within the First Circuit have applied factors developed by other courts outside the First Circuit.  For example, in *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 401 (D. Mass. 2008), the court looked to the following factors to assess reasonableness for attorneys' fees: (1) the reaction of class members to the settlement and proposed attorneys' fees; (2) the skill and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risk that the litigation will be unsuccessful; (5) the amount of time devoted to the case by counsel; and (6) the extent of the benefit obtained. *See also In re Relafen Antitrust Litig.*, 231 F.R.D. at 79; *In re Lupron Mktg. and Sales Practices Litig.*, No. 01-CV-10861, 2005 U.S. Dist. LEXIS 17456, at *12 (D. Mass. Aug. 17, 2005).   Applying these factors to this case demonstrates that the requested attorneys' fees of $937,500 (25% of $3.75 million) are reasonable.

**1.    The Extent of the Benefit Obtained**

The Settlement provides significant benefits to the Class.   Pursuant to the Parties' Settlement Agreement, Vibram will establish a non-reversionary Settlement Fund of $3.75 million.  *See* Settlement Agreement, § III.A.1.  The Settlement makes these monetary benefits available to Class Members for up to two pairs of FiveFingers footwear without a requirement for submitting proof of purchase. *See id.*, § III.B.5.

In addition to creating a non-reversionary monetary benefit for the Class, as indicated in the Settlement Agreement, Vibram agreed to implement numerous changes in its challenged advertising.  *See* Settlement Agreement, § III.D.  This relief is significant as it provides important protection to consumers against future improper conduct.   *See, e.g.,*

*Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 698 (S.D. Fla. 2014) (rejecting objector's argument that injunctive relief should not be used as support for requested attorney's fees); *Wexler*, 496 F. Supp. 2d at 154 ("[t]he value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant.") (citing *Comm. for GI Rights*, 518 F.2d at 472-73).  Here, the fee award of 25% of the settlement value does not take into account any value of the injunctive relief achieved through this Settlement, but further supports the reasonableness of the requested fees.

### 2.     Reaction of the Class Members

Although the August 15, 2014 deadline for Class Members to object to any aspect of the Settlement or to the application for attorneys' fees and expenses has not yet passed, so far, as of July 31, 2014, there have been no objections to the fee request.[5]

Furthermore, as discussed in further detail in the Final Approval portion of this Motion, the reaction of the Class to the Settlement has been extremely positive.  Indeed, to date, there have been no objections to any aspect of the Settlement, fees or expenses, or Plaintiff service awards, and only 16 Class Members have excluded themselves from the Settlement.  *See* Prutsman Decl., ¶ 9.  Accordingly, this factor strongly weighs in favor of this Court's approval of the fee request here.

### 3.     The Skill and Efficiency of the Attorneys Involved

The quality of the representation and the standing of counsel at the bar are important factors in determining the reasonableness of the requested fee.  *See Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992).  Here, Lead Class Counsel are nationally known leaders

---

[5]     As set forth in § V above, and in the Prutsman Declaration, notice to prospective Class Members was adequate.

in complex representative litigation, including consumer fraud class actions.  *See* concurrently submitted Declaration of Janine L. Pollack in Support of Motion for Final Approval of Class Action Settlement ("Pollack Final Approval Decl.," attached as Exhibit 1) Ex. A (Lead Class Counsel's firm resume); § II.B.3 above (discussing the experience of Lead Class Counsel and certain of Plaintiffs' Counsel).  Indeed, as demonstrated in the detailed complaint and motion to dismiss briefing, and by virtue of the previous experience Lead Class Counsel and certain of Plaintiffs' Counsel have had successfully litigating false advertising actions in general and those involving footwear products marketed as providing toning and strengthening benefits in particular, this Settlement was made possible because of the reputation of Lead Class Counsel and the other Plaintiffs' Counsel. Plaintiffs' Counsel's skillful and efficient litigation clearly demonstrates their quality here.  From their extensive, thorough, and detailed complaint and related briefing, the extensive discovery they conducted, and their skillful settlement negotiations, Plaintiffs' Counsel obtained a settlement that will provide a value of $3.75 million (in addition to changes already implemented by Vibram).  This factor supports the reasonableness of Plaintiffs' Counsel's fee request.[6]

### 4.    Complexity and Duration of the Litigation

Nationwide consumer fraud class actions, like the Actions here, are difficult and complex.   From the outset, Plaintiffs' Counsel faced highly complex questions about the

---

[6]      Courts have frequently viewed the quality of opposing counsel as an important factor in evaluating the quality of the services rendered by plaintiff's counsel. *See In re Computron Software, Inc., Sec. Litig.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) ("performance and quality of opposing counsel" was factor in determining appropriate fee); *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1337 (C.D. Cal. 1977) (same).   Here, Vibram was represented vigorously by experienced and able counsel from Jones Day, a prominent and highly respected firm with ample resources, which proved a formidable opponent throughout the duration of the Actions.

benefits of Vibram's FiveFingers footwear and whether the effects squared with Vibram's advertising and marketing representations.   Indeed, for over two and a half years, Plaintiffs' Counsel investigated and litigated Vibram's advertising and marketing claims.

If the litigation continued, Plaintiffs anticipate intricate arguments by Vibram that its acts did not cause any injury-in-fact or damages to Plaintiffs and the Class and that a class could not be certified in this case.   For example, as noted above, Vibram has already argued at the motion to dismiss stage, and would likely continue to argue, that (1) Plaintiffs and the Class Members saw and relied on different advertisements; (2) bought the shoes for different purposes, uses and reasons; (3) the shoes at issue do in fact provide the health benefits represented in Vibram's advertising and marketing; and (4) certain proposed Class Members purchased Vibram's shoes for reasons unrelated to the advertising at issue in the Actions.   Indeed, Vibram moved to strike the class allegations in the Action based on an argument that "members of the proposed class might have purchased various styles of FiveFingers, for any number of different purposes, by several different means, based on any number of representations, and at a variety of prices."   *See* ECF No. 38 at 25.   Vibram would also likely restate its argument made at the pleadings stage that a nationwide or multi-state class is unconstitutional and precluded under applicable choice of law principles (*see* ECF No. 38 at 26), and that a class-wide damages methodology fails under *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).   These and other complex issues would have required extensive expert testimony and there is no guarantee that a jury would believe Plaintiffs and their experts over those of Vibram.   Further, as discussed above, the quality of opposing counsel is an important factor in evaluating the quality of the services rendered by Plaintiffs' Counsel.   Here, Vibram was represented by formidable attorneys who are highly experienced in complex litigation.

Accordingly, this factor also strongly supports the reasonableness of the fee request.

### 5. The Risk that the Litigation Will Be Unsuccessful

#### a. Success at Trial Was Far from Guaranteed

Although Plaintiffs and Plaintiffs' Counsel strongly believe in the merits of the Actions, the proposed Class faced a very real risk of recovering nothing at all if the case continued.  As discussed above, Vibram already raised numerous issues that could have led to the dismissal of Plaintiffs' claims prior to trial.  For example, Plaintiffs' claims might not have survived Vibram's pre-trial attacks regarding, *inter alia*, class certification and liability, as discussed above.

Furthermore, victory at trial for the Class was by no means assured.  A trial of liability and damages issues would most certainly involve substantial attorney and expert resources, voluminous documentary and deposition evidence, vigorously contested motions, and considerable judicial resource expenditures.  In negotiating the Settlement, Plaintiffs' Counsel had to recognize the substantial risk of recovering nothing in light of the uncertainties inherent in class litigations.

Even assuming the Class could recover a judgment at trial, the delay through trial, post-trial motions, and the appellate process would likely deny the Class any recovery for years.

Thus, in light of these risks, Plaintiffs' Counsel achieved a substantial recovery for the Class and, as such, the requested fees and expenses are fully justified and should be awarded.

#### b. The Contingent Nature of Plaintiffs' Counsel's Representation Also Supports the Requested Fee

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation."  *Teachers' Ret. Sys. v. A.C.L.N. Ltd.*, No. 01-CV-11814, 2004 U.S. Dist. LEXIS 8608, at *11 (S.D.N.Y. May 14, 2004); *see also In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460 (D.P.R. 2011) (noting that "whenever an attorney

takes a case on a contingency basis, as [l]ead [c]ounsel has done, there is always the risk of non-payment.  Certainly there are instances where diligent and experienced plaintiffs attorneys pour thousands of hours and dollars into their class action case only to recover little or nothing at trial or on appeal"); *In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *15 ("Many cases recognize that the risk assumed by an attorney is perhaps the foremost factor in determining an appropriate fee award."); *In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (concluding it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award"); *In re Prudential Sec. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award.").

This risk encompasses the risk of no payment and even underpayment.  *See In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d at 268 ("Co-Lead Counsel, it must be remembered, took this case on a wholly contingent basis.  Had they lost on summary judgment or fallen short of establishing liability at trial, they would have lost the tens of millions of dollars in expenses and all of the attorney time that they collectively invested in the case."); *In re Relafen*, 231 F.R.D. at 80 ("As class counsel notes, indeed, when Class Counsel undertook representation of the End-Payor Purchaser Class, there were no assurances that any fees would be received.  Class Counsel were aware that they would likely have to expend thousands of hours, and hundreds of thousands of dollars, in prosecuting this case over an extended period of time before having even a possibility of recovering a fee.  Class Counsel alone bore the risk of the case being dismissed at the pretrial stage, of not prevailing at trial, or even losing on appeal."); *In re San Juan Dupont Plaza Hotel Fire Litig.*, 50 F. Supp. 2d 100, 104 (D.P.R. 1999) ("[C]ounsel have undertaken this

litigation subject to substantial risks of loss on the merits and have devoted many hours to the prosecution of this cause with virtually no assurances of payment of their fees."); *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee award where court failed to account for, among other things, risk of underpayment to counsel).

Evaluating the risks undertaken by Plaintiffs' Counsel in prosecuting this complex consumer class action fully supports the reasonableness of the requested fee.  Plaintiffs' Counsel undertook the Actions on a wholly contingent basis.  Plaintiffs' Counsel have not been compensated for their time or expenses since the Actions began, and would have received no compensation or expense reimbursement had this case not been successful.[7]

From the beginning, Plaintiffs' Counsel understood they were embarking on a complex, expensive, and lengthy litigation with no guaranteed compensation for the enormous investment of time and money the case would require.  Because of the nature of a contingent practice where predominantly complex cases last several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance substantial litigation expenses.   Under these circumstances, the financial burden for contingent-fee counsel is far greater than for firms paid on an ongoing basis.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.  Indeed, meaningful settlements in actions such as this can occur because

---

[7]     The risk of no recovery in complex cases of this type is real and heightened when, as here, counsel press to achieve the very best result for those they represent.   There are numerous class actions in which plaintiffs' counsel expended thousands of hours and yet received no remuneration despite their diligence and expertise. *See, e.g., Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm  reversed on appeal); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (Tenth Circuit overturned  securities fraud class action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on basis of 1994 Supreme Court opinion); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (class won on a substantial jury verdict and a motion for judgment n.o.v. was denied, but on appeal the judgment was reversed and  the case dismissed, after 11 years of litigation).

defendants and their counsel know that leading members of the plaintiffs' bar (such as here) stand ready to force a resolution on the merits and force a trial in the case.[8]

### 6.     The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Plaintiffs' Counsel, and their professional support staff, expended substantial time and effort (over 2,262.10 hours for a lodestar of $1,243,539.75 as of July 30, 2014), pursuing the Actions on behalf of the Class.  *See* Pollack Final Approval Decl., ¶¶ 4-8; Plaintiffs' Counsel's concurrently filed declarations, attached as Exhibits 3-11.  Accordingly, the requested fee award of $937,500 represents a fractional multiplier of 0.75.[9]  Further, Lead Class Counsel will need to devote additional time to bring the Settlement to a final resolution, time that will not be part of time currently being submitted to the Court.  *See* Pollack Final Approval Decl., ¶ 6.

### a.     Investigation, Complaints, Motions to Dismiss and Discovery

Plaintiffs' Counsel conducted an extensive and thorough investigation prior to and after filing the initial complaints, which included, *inter alia*, retaining and working with a scientific expert with expertise in the orthopedic and physiological effects of footwear on the human body, gathering and analyzing studies and research concerning barefoot (minimalist) footwear, searching for and reviewing Vibram's advertising and marketing materials for its FiveFingers

---

[8]     To this end, public policy considerations, which is another factor some courts consider in evaluating attorneys' fees requests, favor awarding Plaintiffs' Counsel the fees requested here because Plaintiffs' Counsel provided an "invaluable service by aggregating the seemingly insignificant harms" of Class Members who would likely not pursue redress for harms on an individual basis. *See In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 463; *see also In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *22-23 ("While in the abstract, the public has no particular interest in whether or not lawyers are paid a fee for bringing class actions, there is a significant societal interest in obtaining redress for prescription drug consumers whose harms could not, given the cost of litigation, be pursued on an individual basis.  The public interest is also served by the defendants' disgorgement of the proceeds of predatory marketplace behavior.").

[9]     Even considering the hours and lodestar without the later-transferred *De Falco* action from Illinois, Plaintiffs' Counsel has worked 2,043.43 hours for a lodestar of $1,106,922.25, which is still a fractional multiplier of 0.85.

products, and researching and analyzing available financial and sales information about Vibram generally, and marketing research and strategy analysis and financial and sales information related to Vibram's FiveFingers products in particular. *See* Pollack Preliminary Review Decl., ¶ 4.

On March 21, 2012, Plaintiff Bezdek filed the first above-captioned action in this Court, *Bezdek v. Vibram USA Inc., et al.*, Case Number 1:12-cv-10513-DPW (D. Mass.), alleging violations of Mass. Gen. Laws ch. 26, § 91, Florida Statutes § 501.201 *et seq.*, and unjust enrichment. (ECF No. 1). On July 9, 2012, a putative class action captioned *Safavi v. Vibram USA Inc., et al.*, Case Number CV 12-5900-BRO-JCG (C.D. Cal.) was filed in the United States District Court for the Central District of California. Plaintiff Safavi is represented by the same counsel as Plaintiff Bezdek, and his complaint is substantially similar to hers. Safavi's Complaint includes claims for violations of California's Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, California's Consumers Legal Remedies Act, Civil Code § 1750 *et seq.*, and breach of express warranty. Plaintiffs' Counsel successfully opposed Vibram's motion to dismiss the *Bezdek* complaint and, in the alternative, to strike its class allegations. *See* ECF No. 38.[10]

Following this Court's motion to dismiss ruling, the *Bezdek* Action proceeded into party and non-party discovery, which is described in detail in the memorandum in support of the

---

[10]    On August 8, 2012, Plaintiff De Falco, through different counsel, filed an action in the Superior Court for Will County, Illinois, No. 2012L601. On September 11, 2012, the *De Falco* action was removed to the Northern District of Illinois and docketed as *De Falco v. Vibram USA LLC et al.*, 1:12-CV-07238 before Hon. Virginia M. Kendall. On March 18, 2013, Judge Kendall denied De Falco's motion to remand, granted in part and denied in part Vibram's Motion to Dismiss De Falco's Complaint, and granted Vibram's motion to transfer. *See De Falco* Dkt., ECF No. 36. On December 20, 2013, Plaintiff De Falco moved jointly with Plaintiff Bezdek for a stay in light of settlement negotiations. *See Bezdek* Dkt., ECF No. 58.

motion for preliminary review as well as the Pollack Preliminary Review Declaration.  *See* ECF No. 72 at 8-9; Pollack Preliminary Review Decl., ¶¶ 9-15.  For example, after serving discovery requests, Plaintiffs received documents and information that included the FiveFingers' products': (i) product design, testing, and development; (ii) scientific studies and research about the marketing claims; (iii) marketing, advertising, media, and public relations; and (iv) sales and accounting records.  Vibram served deposition subpoenas on Plaintiffs Bezdek and De Falco, while Plaintiffs served a 30(b)(6) deposition notice on Vibram.  Lead Class Counsel also served document subpoenas on third parties involved in the relevant marketing and science issues. Thus, at the time that the Parties reached a potential settlement agreement and sought a stay, Plaintiffs had prepared and were ready to file their motion for certification of a plaintiff class, and had worked with an expert and were prepared to identify their expert on class issues.  The litigation was thus well advanced and much work had been done that put Lead Class Counsel in a position to evaluate the merits of settlement proposals and to engage in arm's-length settlement negotiations.

### b.       Settlement Negotiations

Plaintiffs' Counsel obtained an excellent result for the Class through their skillful settlement negotiations.  As detailed more fully in the Pollack Preliminary Review Declaration, beginning in late 2012, the Parties agreed to attend a two-day mediation session with Professor Eric Green of Resolution, LLC, in Boston, Massachusetts.  The mediation was scheduled to extend over January 9 and 10, 2013.  However, differences in the Parties' positions remained so significant after the first day that the Parties agreed that it would not be productive to return for the second day.  *See* Pollack Preliminary Review Decl., ¶ 19.  As such, the Parties continued with litigation.

Beginning in late November 2013, following the Court's motion to dismiss ruling, and in the midst of discovery and preparation of the class certification motion, settlement negotiations resumed directly between Lead Class Counsel and Vibram's Counsel.  Discussions continued over the following weeks, during which the Parties communicated numerous times by phone and email over the terms of a potential settlement.  *See id.,* ¶ 20.  The Parties reached an agreement in principle on December 12, 2013.

Although the essential terms of the Settlement were negotiated by December 12, 2013, the Parties still had work to do on details of the Settlement.   This included negotiating terms of the notice program and the documents comprising the notice.  As part of this process, the Parties worked with a class action notice specialist and refined aspects of the Settlement Agreement and its exhibits.  *See id.*, ¶ 20.

### C.   The Requested Fees Fall Well Within the Range of Fees Awarded in Cases Within the First Circuit

The requested fee award is 25% of the $3.75 million monetary value of the Settlement. The requested amount is within if not below the range of percentage awards in numerous litigations throughout this Circuit.  "Courts in this circuit generally award attorneys' fees in the range of 20-30%, with 25% as 'the benchmark[.]'"  *Latorraca v. Centennial Techs., Inc.,* 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011) (collecting cases).  While 25% has been described as a benchmark, district courts have granted awards of attorneys' fees at or above a 30% fee.   *See, e.g., In re StockerYale, Inc. Sec. Litig.*, No. 1:05cv00177-SM, 2007 U.S. Dist. LEXIS 94004, at *21 (D.N.H. Dec. 18, 2007) (awarding 33% of gross settlement fund); *In re Relafen*, 231 F.R.D. at 82 (awarding 1/3 of settlement fund); *Malanka v. de Castro*, Nos. 85-CV-2154, 88-CV-3505, 1990 U.S. Dist. LEXIS 18171, at *3 (D. Mass. Nov. 20, 1990) (awarding 1/3 of settlement fund); *Scovil v. FedEx Ground Package Sys.*, No. 10-515, 2014 U.S. Dist. LEXIS

33361, at *20-22 (D. Me. Mar. 14, 2014) (awarding 1/3 of settlement fund); *Applegate v. Formed Fiber Techs., LLC*, No. 10-473, 2013 U.S. Dist. LEXIS 166171, at *3 (D. Me. Nov. 21, 2013) (awarding 1/3 of settlement fund).

Importantly, in determining the amount of the benefit conferred, the appropriate measure is the total recovery available for the class, not the amount actually claimed by class members. *See Boeing*, 444 U.S. at 480-81; *see also Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997). This method recognizes that the efforts of class counsel established the entire settlement, including non-monetary benefits, for the benefit of the entire class. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (citing *Williams*, 129 F.3d at 1027); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) ("Incidental or nonmonetary benefits conferred by the litigation are a relevant circumstance.").

Accordingly, the requested percentage of 25% of the Settlement Fund for attorneys' fees here is, Plaintiffs submit, fair and reasonable and should be awarded by the Court. Vibram agreed not to oppose any request by Plaintiffs' Counsel for attorneys' fees up to 25% of the Settlement Fund, to be paid for from the Settlement Fund.

### D.      Plaintiffs' Counsel's Lodestar Supports Their Fee Request

The requested fees are also reasonable when evaluated in relation to Plaintiffs' Counsel's lodestar. In the First Circuit, the lodestar approach, though not required, can serve as a check on the appropriateness of the percentage of funds fee. *See New England Carpenters Health Benefits Fund v. First Databank, Inc.,* No. 05-11148, 2009 U.S. Dist. LEXIS 68419, at *8 (D. Mass. Aug. 3, 2009); *see also In re Relafen*, 231 F.R.D. at 81-82. Under the lodestar method, a court must engage in a two-step analysis:  first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate;

and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained and the quality of the attorney's work. *See, e.g., Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167-69 (3d Cir. 1973), subsequently refined in *Lindy Bros. Builders v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116-18 (3d Cir. 1976) (*en banc*).   Performing the lodestar cross-check here confirms the reasonableness of the fee requested by Plaintiffs' Counsel.

Plaintiffs' Counsel spent more than 2,262.10 hours in the prosecution of the Actions, resulting in a lodestar of $1,243,539.75.   Thus, the requested fee of $937,500 results in a fractional multiplier of approximately 0.75 of Plaintiffs' Counsel's time.[11]   Courts have held that a fractional or negative multiplier is highly suggestive of the reasonableness of requested attorneys' fees. *See, e.g., Covillo v. Specialty's Café*, No. C-11-00594 DMR, 2014 U.S. Dist. LEXIS 29837, at *24 (N.D. Cal. Mar. 6, 2014); *see also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (awarding fees of 33 1/3%, noting that even in a mega-fund case, there is "no real danger of overcompensation" where the award represents a fractional multiplier to the lodestar); *In re Blech Sec. Litig.*, Nos. 94 CIV. 7696(RWS), 95 CIV. 6422(RWS), 2000 U.S. Dist. LEXIS 6920, at *15 (S.D.N.Y. May 19, 2000) (awarding lead counsel 30% of the settlement, and confirming that the award was reasonable because it represented a fractional multiplier of lead counsel's lodestar).[12]

---

[11]     As noted above, Plaintiffs' Counsel had a fractional multiplier of 0.85 without the later-transferred *De Falco* action.

[12]     This multiplier is further reasonable because the First Circuit has noted that multipliers as high as 4.5 have been appropriately awarded in protracted complex litigation. *See Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 613 (1st Cir. 1985) ("While multiples of 2, 3, 4, and 4.5 have (continued…)

### E.   Plaintiffs' Counsel's Request for Reimbursement of Expenses Should Be Granted

In addition to attorneys' fees, Plaintiffs' Counsel also respectfully request the approval of the reimbursement of expenses incurred while prosecuting the Actions.    A total of $62,133.68 in expenses was reasonably and actually incurred.  *See* Pollack Final Approval Decl., ¶ 10.  It is well-settled that attorneys who have created a common fund for the benefit of a class are entitled to reimbursement for their expenses incurred in creating the fund.  *See, e.g., Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 389-90 (1970); *In re Fidelity/Micron Sec. Litig.*, 167 F.3d at 737 ("lawyers whose efforts succeed in creating a common fund for the benefit of a class are entitled . . . to recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax.").

The submitted expenses in this case were all reasonable, necessary, and directly related to the prosecution of the Action.[13]   The expenses are attributable to items such as mediation and filing fees, the costs of computerized research, an electronic document review database, copying documents and other expenses incurred in the ordinary course of litigation, such as travel and

_____

(…continued)

occasionally been given, these multipliers occur primarily in protracted multidistrict antitrust and securities cases involving recoveries of ten million dollars or more"); *see also New England Carpenters*, 2009 U.S. Dist. LEXIS 68419, at *9-10 (approving 8.3 lodestar multiplier); *Conley*, 222 B.R. at 182 (8.9 multiplier).  Moreover, the 0.75 multiplier here falls well below the range of multipliers awarded by courts within this Circuit and elsewhere.  *See, e.g., In re CVS Corp. Sec. Litig.*, C.A. No. 01-11464 (JLT), slip op., at 7 (D. Mass. Sept. 7, 2005) (awarding 25% of $110 million, representing 3.27 multiplier); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) (3.5 multiplier); *In re Aetna Inc. Sec. Litig.*, No. MDL 1219, 2001 U.S. Dist. LEXIS 68, at *59 (E.D. Pa. Jan. 4, 2001) (awarding 30% of $82.5 million settlement fund, representing 3.6 multiplier).

[13]    The expenses incurred in the Actions are described in further detail in the accompanying Plaintiffs' Counsel's Declarations, attached as Exhibits 3-11.

related expenses.   *See* Exs. 1, 3-11.   All of these expenses were reasonably and necessarily incurred, and are of the sort that would typically be billed to paying clients in the marketplace. *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007) (awarding as reasonable and necessary, reimbursement for "1) meals, hotels, and transportation; 2) photocopies; 3) postage, telephone, and fax; 4) filing fees; 5) messenger and overnight delivery; 6) online legal research; 7) class action notices; 8) experts, consultants, and investigators; and 9) mediation fees"); *Beane v. Bank of N.Y. Mellon*, No. 07 Civ. 09444 (RMB), 2009 U.S. Dist. LEXIS 27504, at *25-26 (S.D.N.Y. Mar. 31, 2009) (awarding as "properly chargeable to the Settlement Fund," because they "are the type for which the paying, arms' length market reimburses attorneys," reimbursement for court fees, photocopying and reproduction, deposition transcripts, postage and messenger services, transportation and lodging, telephone bills, and expert and electronic litigation database support).

Accordingly, Plaintiffs' Counsel respectfully submit that their request for reimbursement of these expenses of $62,133.68 (which is less than the $70,000 stated in the Notice) is reasonable and should be approved.

### F.      Each Plaintiff Should Be Awarded a Service Award

The Plaintiffs in the Actions seek service awards to compensate them for their efforts. Plaintiffs Bezdek and De Falco each seek an award of $2,500 in light of their involvement in their respective litigations as detailed in the declarations that they have submitted in support of this motion.   *See* Declaration of Valerie Bezdek ("Bezdek Decl.," attached as Exhibit 12); Declaration of Brian De Falco ("De Falco Decl.," attached as Exhibit 13).   Plaintiff Safavi seeks an award of $1,500 due to his active involvement in his Action until it was stayed by the District

Court for the Central District of California, and subsequent efforts in connection with the Settlement. *See* Declaration of Ali Safavi ("Safavi Decl.," attached as Exhibit 14).

Federal courts often approve case contribution awards to plaintiffs who prosecuted actions on the theory that there would be no class-wide benefit absent their suits. These awards recognize the burdens assumed by plaintiffs in instituting and prosecuting the actions, the time spent on communicating with counsel and fulfilling responsibilities of supervision, and the risks that plaintiffs bear in bringing the suit. *See In re Relafen*, 231 F.R.D. at 82 ("Because a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."); *In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *24-25 ("Incentive awards serve an important function in promoting class action settlements, particularly where, as here, the named plaintiffs participated actively in the litigation.").

"In granting incentive awards to named plaintiffs in class actions, courts consider not only the efforts of the plaintiffs in pursuing the claims, but also the important public policy of fostering enforcement laws and rewarding representative plaintiffs for being instrumental in obtaining recoveries for persons other than themselves." *Bussie v. Allmerica Fin. Corp.*, No. 97-CV-40204, 1999 U.S. Dist. LEXIS 7793, at *11-12 (D. Mass. May 19, 1999).

The Plaintiffs here have been actively involved in all stages of the litigation. They vigorously pursued the interests of the Class by undertaking the responsibilities attendant with serving as a named plaintiff, including searching their files for relevant records, communicating with Plaintiffs' Counsel, and making themselves available whenever needed. *See* Pollack Final Approval Decl., ¶ 11; Bezdek Decl.; De Falco Decl.; Safavi Decl. Plaintiffs likewise kept themselves informed of the various attempts at resolution of the Actions and, after extensive

discussions with Plaintiffs' Counsel, agreed to the terms of the proposed Settlement. *See* Pollack Final Approval Decl., at ¶ 11. Moreover, the awards sought represent amounts that are less than or even with other awards approved in similar class actions in this Circuit.[14]

In sum, the requested modest awards to the named Plaintiffs are fair and reasonable and should be approved by the Court.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) confirm certification of the Class for Settlement purposes; (2) grant final approval of the Settlement; (3) approve Lead Class Counsel's application for attorneys' fees in the amount of $937,500 and reimbursement of expenses in the amount of $62,133.68; and (4) approve $2,500 service awards for Plaintiffs Bezdek and De Falco and a $1,500 service award for Plaintiff Safavi.

Dated: August 4, 2014

**BERMAN DEVALERIO**

By:   /s/ Nathaniel L. Orenstein
GLEN DEVALERIO (BBO #122010)
NATHANIEL L. ORENSTEIN (BBO #664513)
One Liberty Square
Boston, MA 02109
Telephone: 617-542-8300
Facsimile: 617-542-1194
gdevalerio@bermandevalerio.com
norenstein@bermandevalerio.com

***Local Counsel for Plaintiffs***

*(Continued)*

---

[14]     *See, e.g., In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 469 (awarding an $8,000 service award per class representative totaling $48,000); *In re Relafen*, 231 F.R.D. at 82 (awarding $8,000 to each named consumer plaintiff, $9,000 to each consumer organization, and $14,000 for each named third party payor plaintiff); *In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *24-25 (granting 18 plaintiff awards ranging from $2,500 to $25,000 each).

**WOLF HALDENSTEIN ADLER FREEMAN
  & HERZ LLP**
JANINE L. POLLACK
270 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212-545-4600
Facsimile: 212-686-0114
pollack@whafh.com

***Lead Class Counsel***


**BLOOD HURST & O'REARDON, LLP**
TIMOTHY G. BLOOD
THOMAS J. O'REARDON II
701 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619-338-1100
Facsimile: 619-338-1101
tblood@bholaw.com
toreardon@bholaw.com

**SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP**
JAMES C. SHAH
35 East State Street
Media, Pennsylvania 19063
Telephone: 610-891-9880
Facsimile: 610-891-9883
jshaw@sfmslaw.com

**GARY ROBERTS & ASSOCIATES, P.A.**
MICHAEL K. BECK
324 Datura Street
Suite 223
West Palm Beach, FL 33401
Telephone: 561-686-1800
Facsimile: 561-686-1533
michael@palmbeachtrialattorney.net

*(Continued)*

**POMERANTZ LLP**
JAYNE A. GOLDSTEIN
1792 Bell Tower Lane, Suite 203
Weston, FL 33326
Telephone: 954-313-3454
Facsimile: 954-313-3455
jagoldstein@pomlaw.com

**MILBERG LLP**
JOSHUA E. KELLER
One Pennsylvania Plaza
49th Floor
New York, NY 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229
jkeller@milberg.com

**THE BREEDEN LAW FIRM**
TONY W. BREEDEN
578 Washington Boulevard, Suite 552
Marina Del Rey, CA  90292
Telephone:  310-984-6861
Facsimile: 310-984-6849
tony@breedenlawfirm.com

**SWEETNAM LLC**
WILLIAM M. SWEETNAM
582 Oakwood Avenue, 200
Lake Forest, IL 60045
Telephone: 847-559-9040
Facsimile: 847-235-6618
wms@sweetnamllc.com
mmr@sweetnamllc.com

**WHATLEY KALLAS, LLC**
PATRICK J. SHEEHAN (BBO # 639320)
60 State Street, Seventh Floor
Boston, Massachusetts 02109
Telephone: 617-573-5118
Fascimile: 617-573-5090
psheehan@whatleykallas.com

***Plaintiffs' Counsel***

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on August 4, 2014.

/s/ *Nathaniel L. Orenstein*
Nathaniel L. Orenstein